[See Case No. 9,245.]

---

MASON (MATILDA v.). See Case No. 9,280.

MASON (MAURY v.). See Case No. 9,314.

---

## Case No. 9,247.

### MASON v. MUNCASTER et al.

[2 Cranch, C. C. 274.] [1]

Circuit Court, District of Columbia. Nov. Term, 1821. [2]

RELIGIOUS SOCIETIES—VESTRY AND CHURCH WARDENS—SALE UNDER DECREE—ESTOPPEL.

1. The vestry and wardens of "the Protestant Episcopal Church of Alexandria," were the vestry of the Protestant Episcopal Church in the parish of Fairfax, in the ecclesiastical meaning of those terms as modified by the laws and constitution of Virginia, and the canons of the church.

2. By the sale made under the decree in the case of Taylor v. Terrett [9 Cranch (13 U. S.) 43] the purchasers became privies to the church, and may avail themselves of the estoppel resulting from the warranty of Daniel Jennings, the original grantor.

This was a bill in equity [by John Mason against John Muncaster and others,] praying for an injunction to stay the proceedings at law upon judgments rendered upon two promissory notes given for part of the purchase-money of the glebe, belonging to the parish of Fairfax, which had been purchased by the complainant and Mr. Jones, at the sale made under the decree of this court, affirmed by the supreme court of the United States, in the case of Taylor v. Terrett, 9 Cranch [13 U. S.] 43, and praying, also, that the sale may be set aside for defect of title; that the notes may be given up to be cancelled, and that the part of the purchase money which had been paid, may be decreed to be refunded, &c.

The complainant in his bill states, that he purchased upon the faith of the decree of the supreme court, which he supposed to be binding upon all the world. That the opinion of that court was not printed till 1817, and that it is but very recently that his attention was directed to the reasonings in detail, upon which the decree was founded, and which he now perceives was founded upon the assumption of two facts which do not exist, viz.: (1) that the congregation of the Episcopal church of

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Affirmed in 9 Wheat. (22 U. S.) 445.]

Alexandria is identical with the original parish of Fairfax, as it existed prior to the assumption of jurisdiction over the District of Columbia by congress; and that the vestry and church-wardens elected by and acting under the authority of that congregation, come in by legal and regular succession to the vestry and church-wardens of the parish of Fairfax; and (2) that there was no other Episcopal church in the parish of Fairfax, than that of Alexandria; and that the property belonged to the church of Alexandria, which in this respect represented the whole parish. The complainant further states, that there are two parties, who were not concluded by the decree, and who have a manifest interest and outstanding title, viz.: 1. The parish of Fairfax, in Virginia, which has a right to the whole glebe; and that many of the members of the Episcopal Church in that parish have threatened that the rights of that parish are to be prosecuted. 2. The heirs of Daniel Jennings, to whom the legal title will revert in consequence of the defeat of the capacities of perpetual and legal succession in the church-wardens, Dade and Wren, and the want of limitation by the deed, to their heirs in their natural capacity; so that the only protection of the complainant would be by setting up the estoppel in Jenning's deed, which he could not do, because there is no legal succession from the church-wardens Dade and Wren, to the church-wardens, Deneale and Muncaster, and so no privity between the complainant and the parish of Fairfax. By a supplemental bill, the complainant asserts that there is now a regular and duly elected vestry and wardens of the Falls Church, in the parish of Fairfax, as competent to assert the rights of the church of that parish as the defendants.

The answer of the defendants, (the vestry and church-wardens appointed by the church in Alexandria,) asserts that they are the vestry and wardens of the whole parish, and are the regular successors of the vestry from the year 1765, and that there never has been but one vestry for both churches in the parish. It contends that the complainant had full knowledge of the state of the title at the time he purchased, and that the question of the outstanding title in Jennings was settled by the supreme court in the case of Taylor v. Terrett [supra].

There were many exhibits, and much testimony, and the cause which came on to be heard on a motion to dissolve the injunction, which had been granted, was fully and ably argued upon the whole merits, by Mr. Key and Mr. Wirt, (the attorney-general,) for complainant.

Mr. Taylor, Mr. E. J. Lee, and Mr. Swann, for defendants.

After the argument, it was agreed that the cause should be considered as having been set for final hearing, and that the opinion of the court should be given at the next term.

CRANCH, Chief Judge. After the decision of the case of Taylor v. Terrett in the supreme court of the United States, the only question left open to the complainant in this case seems to be, whether the complainants in that case were the representatives of the cestuis que trust of the glebe; or in other words, whether they, with George Deneale and John Muncaster, two of the defendants in that case, were, at the time of filing the bill, (22d November, 1811,) the vestry of the Protestant Episcopal Church, in the parish of Fairfax, in the ecclesiastical meaning of those terms as modified by the laws and constitution of the state of Virginia, and the canons of the church. For, if they were, the supreme court having decided that that church was the cestui que trust, and that the vestry, as incident to their office as general guardians of the church, were entitled to assert its rights and interests, and with the assent of the minister, had a right to require a sale of the land; a sale so made by them, would constitute the purchasers privies to the church; and would enable them to avail themselves of the estoppel resulting from the warranty of D. Jennings, the original grantor; and they would be in no danger from the outstanding title in the heirs of that grantor, nor from the claims of that portion of the parishioners, (if any such there be,) who reside in the county of Fairfax.

After the Revolution, when the Protestant Episcopal Church ceased to be the established church in Virginia, and the vestries ceased to have the power to tax their respective parishes, a Protestant Episcopal parish in the ecclesiastical meaning of those terms, consisted only of those inhabitants of a territorial parish, who were members of the Protestant Episcopal Church. The word parish, therefore, in its ecclesiastical sense in regard to the Protestant Episcopal Church of Virginia, was synonymous with the phrase, "Protestant Episcopal Church in the same parish;" or, in other words, a parish, in its ecclesiastical sense, in Virginia, after the Revolution, meant the Protestant Episcopal Church in a parish. And the Protestant Episcopal Church in a parish consisted of the members of that church who resided within the territorial parish.

The right to the glebe in question, is decided by the supreme court to be in the Protestant Episcopal Church, in the parish of Fairfax. No individual member of the church has any interest therein, but in right of his church. It is a social, not an individual right. The Protestant Episcopal Church in the parish of Fairfax is recognized by the act of Virginia of 1786, as a religious society capable of having property, and belonging to a sect which could make, or had made rules for regulating the appointment of trustees. In May, 1787, the convention of the Protestant Episcopal Church of Virginia, ordained rules for that purpose, which rules are recognized by the act of 1788, which declares that the trustees

of the Protestant Episcopal Church, (appointed according to their rules,) and their successors shall be considered successors of the former vestries, and have the same powers.

The repeal of the acts of 1786 and 1788, did not affect the right of the sect (that is, the convention,) to make such rules, because the right was not given by those acts. They are only evidences of a preëxistent right. The vestrymen, who were complainants in the bill of Taylor v. Terrett were duly appointed according to the rules of their sect, (that is, the canons of their church.) There is no evidence of the particular manner in which they were chosen, but it is certified by the church-wardens, that they were duly elected to serve the parish as vestrymen for the next three years; and the fact must be admitted, unless the contrary be proved. The only remaining question then, is, what parish were they to serve? The complainant's counsel say, not the parish of Fairfax, but the Alexandria congregation, or as they call themselves in the vestry-book, "The Protestant Episcopal Church of Alexandria," which had abandoned the parish of Fairfax, and set itself up in 1803, as a separate religious society. And they give this answer to the question, because they say there are no entries in the vestry-book from the 19th of April, 1799, to the 2d of April, 1804; because on the 15th of June, 1803, there was a new agreement entered into by certain subscribers to the church; because the vestry which was elected in 1804, and all the subsequent vestries, styled themselves the vestry of the Protestant Episcopal Church at, or in, or of, Alexandria, and never called themselves the vestry of the parish of Fairfax, as all the former vestries did; because in two or three instances, in the minutes of the proceedings of the vestry, they speak of the parish of Alexandria; and because the vestry suffered the Falls Church to go to ruin.

The court, however, is of a different opinion. We think the parish, mentioned in the minutes of the election of the vestry in 1810, was the parish of Fairfax: 1. Because the entry is made in the vestry-book of the parish of Fairfax.

2. Because there was no other parish which they could serve as vestrymen.

3. Because all the vestries chosen since 1803, have uniformly held, and claimed to hold the glebe, and the church, and all the church-property belonging to the Protestant Episcopal Church in the parish of Fairfax, in the right of that church, and as representing the whole Protestant Episcopal Church in that parish, and have exercised all the rights of property over the same, which a vestry could exercise.

4. Because when the congregation at the Falls Church ceased to exist, the Alexandria congregation became the only Protestant Episcopal congregation in the parish, and constituted the whole Protestant Episcopal Church in the parish. All the Protestant Episcopal inhabitants in the parish, who had a right to vote at all for a vestry, had a right to attend the election held in April, 1810, and to vote for vestrymen; and if they did not, it was their own fault.

5. Because there is no evidence to satisfy us that the Alexandria congregation abandoned the parish of Fairfax, or any of their parochial rights, or ever formed themselves into a separate religious society. The omission of entries in the vestry-book, is accountable for without supposing any such abandonment. There are twelve blank pages left between the minutes of 1796 and 1804, from which circumstance, a strong inference may be drawn that the person who left those blank pages supposed there were minutes of proceedings which had not been entered in that book; and, in fact, a rough minute-book has been produced in evidence, containing the minutes of several meetings of the vestry in 1796, 1798, and 1799, which ought to have been entered in those blank pages. It also appears in evidence that the minutes of the proceedings of the vestry were sometimes taken upon loose sheets; and that there was no time between 1796 and 1804, when there was not a regular vestry. There was a meeting of the vestry on the 16th of April, 1799, at which Mr. William Fitzhugh was elected a vestry-man, in the place of Mr. Hunter, who had resigned. As this meeting was after Easter Monday of that year, (which happened on the 25th of March,) and that being the day and year when a vestry ought to have been chosen, a strong presumption arises that a vestry was chosen in March, 1799, although no minute of such an election is preserved. It is true that the election of the vestry in 1804 (of which there is an entry in the book) raises a strong presumption that no vestry was chosen in 1802, when, regularly, it ought to have been chosen; for, the elections being triennial, if a vestry had been elected in 1802, it would not have been necessary to choose one in 1804; the old vestry, however, had a right, under the canons of the church, to act until a new vestry should be chosen. Under such circumstances, a single omission to choose a vestry, at the regular day, cannot justify an inference that the congregation of Alexandria had abandoned their parochial rights. The agreement of the 15th of June, 1803, which is fastened into the vestry-book with wafers, (evidently for its preservation,) instead of proving an abandonment of parochial rights, and the formation of a new and separate religious society, justifies a strong contrary inference. Its sole object is to raise a fund (by renting the pews of the church) for the support of the Rev. Thomas Davis, who was regularly inducted as rector of Fairfax parish in the year 1792, and continued to be the rector of that parish until October, 1806; during all which time the right of the church to the glebe was vested in him as persona ecclesiae. The subscribers to that paper agreed to hire certain pews at certain

prices, and pay $1,000 per annum to Mr. Davis, the residue to be applied to the use of the church. The resolutions of the 18th of November, 1803, which are written on the page next after the agreement of the 15th of June, 1803, have no other object than the agreement; and afford no evidence either of the intention to abandon the parish, or to form a new religious society; but do, with the agreement, show the strongest evidence of a determination to adhere to the parish, and to support its rector and its church.

The counsel for the complainant seems to rely much upon the circumstance that the vestry of 1804, and all the subsequent vestries style themselves the vestry of the Protestant Episcopal Church at, or in, or of Alexandria, and never call themselves the vestry of the parish of Fairfax, as all the former vestries did. This circumstance is, at most, only evidence that they did not think themselves entitled, or did not choose to call themselves by that name. There is no evidence of the reason why they did not think themselves so entitled, or why they did not choose so to call themselves. One thing, however, is certain, namely: that it was not because they had abandoned their parochial rights. And if it was not evidence of an abandonment of those rights, it does not seem to be material to the complainant what were the motives of the vestry. The omission to call themselves by their right name did not work a forfeiture of the rights of their constituents; nor did they lose their rights by their ignorance of them. Their constituents were all those who had a right to vote at that election; and consisted of all the members of the Protestant Episcopal Church in the parish of Fairfax who had a right to vote at all elections of vestrymen. If the vestry was the real representative of the Protestant Episcopal Church in the parish of Fairfax, it is immaterial by what name they called themselves.

Although it may not be necessary in this case to ascertain what was the reason which induced the vestry of 1804, and the succeeding vestries to call themselves the Protestant Church of Alexandria, and to omit to call themselves the vestry of the parish of Fairfax, as their predecessors had done, yet it may be satisfactory if we can account for that circumstance without the necessity of an inference that they had abandoned their parochial rights. They might have supposed that the Protestant Episcopal Church of Virginia had been broken down by the acts of 1799 and 1802, and therefore felt a reluctance to take a name which should imply a connexion with the church. They might have erroneously supposed that the best way of preserving the rights of the Protestant Episcopal Church in Fairfax parish, was to have as little apparent connexion with it as possible. They knew that the Alexandria congregation was the only remaining Protestant Episcopal congregation in the parish, and

really constituted the whole of the Protestant Episcopal Church in that parish; and as almost all the members of that congregation, and the whole glebe were in that part of the parish of Fairfax which had been ceded to the United States, they might have erroneously supposed that there would be an impropriety in calling themselves the vestry of the parish of Fairfax. There was also an ambiguity in the words church, and parish, which might tend to confuse and perplex their ideas on the subject. They might have supposed that as the only remaining Protestant Episcopal congregation in the parish worshipped in Alexandria, they might with more propriety be called the Protestant Episcopal Church of Alexandria than the Protestant Episcopal Church of Fairfax parish; and as the civil jurisdiction of part of the territorial parish of Fairfax had been ceded to the United States, they might not have been aware that the ecclesiastical parish still remained entire. Supposing it to be divided, they might have thought it would be improper in them to take the name of the entire parish. The circumstance, also, that the county, as well as the parish, bore the name of "Fairfax," tended to increase the confusion of ideas on the subject. The circumstances, in which they found themselves, were new. Their ideas, at first, must have been confused and unsettled as to the whole extent of their rights; but it seems clear, that from the first, they claimed the exclusive right to all the church property, upon the ground that they constituted the whole of the Protestant Episcopal Church in Fairfax parish. It is immaterial by what name they called themselves. All their acts showed that they claimed and exercised all the ecclesiastical rights of that parish. This view of the subject explains, and gives consistency to all their acts. In three instances, namely, on the 20th of October, 1809, and the 18th and 24th of February, 1810, the minutes of the vestry speak of obtaining a rector for the parish of Alexandria. This was, no doubt, an inaccurate expression, and arose from the same confusion of ideas which has been already mentioned.

It was strongly urged by the complainant's solicitor, that the complainants in the case of Taylor v. Terrett could not avow themselves to be the vestry of the whole parish of Fairfax without confessing themselves to be guilty of sacrilege in suffering the building commonly called the Falls Church to go to ruin. But surely it cannot be called sacrilege to suffer a useless building to go to decay. When the vestry ceased to have the power to tax the parish, its obligation, to keep the churches in repair, ceased also. They could only be kept in repair by voluntary contributions. The Falls Church was erected solely for those members of the church who lived in its vicinity. It was for them to keep it in repair; and if they did not, the vestry was not responsible. But the hy-

pothesis of the complainant's counsel would charge the vestry with a much heavier sin than that of repairing a useless church. It would charge them with knowingly seizing upon, and converting to their own use, or the use of their constituents, property to which they had no right. The weight of this argument, therefore, turns against the complainant.

6. We are of opinion that the Alexandria congregation did not separate themselves from the parish of Fairfax, and establish a distinct separate religious society, because they could not do so consistently with the canons of the church then in force.

Upon the whole, then, we are of opinion that the complainants in the bill of Taylor v. Terrett, together with George Deneale and John Muncaster, two of the defendants in that case, were the vestry of the Protestant Episcopal Church in the parish of Fairfax, in the ecclesiastical meaning of those terms, as modified by the laws and constitution of Virginia and the canons of the church, and may avail themselves of the estoppel resulting from the warranty of Daniel Jennings, the original grantor; and therefore the complainant has failed to support his bill; which must be dismissed with costs.

The complainant appealed to the supreme court of the United States, where the decree of this court was affirmed. See 9 Wheat. [22 U. S.] 445.